number 2510489 Porch.com v. Gallagher Re. Mr. Hernandez. Good morning, your honors. May it please the court. Alan Hernandez for the appellant Porch.com. Homeowners of America is a Texas insurance company that trusted and paid its broker, Gallagher Re, to secure a reinsurance policy that would protect HOA's business and its policy holders. Gallagher failed miserably. Ignoring red flags at every turn, Gallagher brokered a policy consisting only of fraudulent collateral issued by China Construction Bank as part of an elaborate international fraud. In other words, Gallagher secured no reinsurance at all. Making matters worse, Gallagher falsely assured HOA that it had valid collateral in place and on that basis authorized the release of 25 million dollars to the fraudsters. The district court here reversibly erred when it dismissed Porch's complaint on a 12b6 motion and deprived HOA of any fact discovery into Gallagher's failures. The court repeatedly adopted Gallagher's exceedingly narrow interpretations of the contract. Interpretations under which Gallagher did not know did not owe any meaningful duties to its client at all. Gallagher will urge those same readings to this court this morning and those readings are untenable. According to Gallagher, they did not have to secure any evidence that China Construction Bank actually agreed to assume this multi-hundred million dollar risk. According to Gallagher, they did not have to comply with the laws that govern their reinsurance brokerage business in Texas. And according to Gallagher, they did not have to conduct even the most basic diligence when authorizing 25 million dollars out the door to the fraudsters. Gallagher is wrong on all counts. Counsel, I think from my perspective, your strongest argument is under section 13 of the agreement. Doesn't mean I've decided that you don't have arguments under the other ones, it just strikes me that this one, the section 13 comes the closest to describing what you're saying is the breach here. Now, that section requires Gallagher to provide administrative services in connection with reinsurance contracts and that's defined as all servicing duties customarily performed by a reinsurance intermediary broker. Now, I suspect that the argument from the other side is going to be that describes ministerial duties and you're reading too much into that provision. If that's the argument, I think it is the argument, what is your response to that? Yes, your honor, and I think we've got strong arguments in all three, but I do agree section 13 is the most straightforward basis for reversal here. Gallagher's argument is, I think the extent of their argument on section 13 is this ministerial interpretation. That interpretation in the context of this transaction is not plausible at all. Gallagher was paid millions of dollars to serve as our reinsurance intermediary broker and if that, if the servicing obligations consisted only of paper pushing, moving some money around, shuffling some paperwork, then the transaction makes no sense. I would also point out the text of section 13 defeats their interpretation. As your honor read, section 13 defines administrative services to include all servicing duties customarily performed by a broker after placement of the contract. First of all, that invites a substantial fact dispute on what is customarily performed in the reinsurance brokerage industry. Again, I reiterate, we have had no fact discovery into what is customary. The court resolved this as a matter of law on a 12b6 motion. If you wanted to connect your complaint to the breach of a customary duty, how would you do that? To connect our complaint to a breach of a customary? In other words, you've obviously alleged that they didn't satisfy this section, so explain to me how. Sure, your honor, I would point first and foremost to paragraph 68 of our complaint, where we lay out allegations involving what is arguably the most straightforward breach of section 13, which is this authorization of the $25 million release. We allege that in late 2022, Gallagher told HOA that certain Vestu investors, we now know that to have been effectively a fraudulent operation, requested $25 million in cash out of the account. HOA specifically asked, is this account adequately capitalized to allow for that release? And Gallagher falsely assured us in response that our policy was backed by a $228 million letter of credit, and it was not. That was a breach of their administrative services requirement, which again is defined as customarily performed duties. The letter of credit was procured at the beginning, wasn't it? There are two collateral documents, your honor, yes. I mean, well, I don't mean the letter of credit, I mean the letter from the bank that said someday we'll give you a letter of credit. Yes, it was. The breach we're pointing to in paragraph 68 in response to Judge Duncan's question is about a communication that occurred later in 2022, when Gallagher again, I mean, it's effectively a compounded breach. Right, I know that. Right, there was a diligence failure in the first place, but they again assured HOA that it did have a valid letter of credit in place and it could be released. So, and I want to point out the district court reasoned, this is in our brief, but the district court reasoned that section 13 applies to post-placement services and that our allegations quote focus on failures in the placement. This paragraph 68, what I'm pointing to in paragraph 68, that is fully post-placement. That is in late 2022. Well, that's what the contract says too. Correct, the contract refers to post-placement services. Now, I do want to be clear, your honors, I don't think section 13 is limited to post-placement services. The contract in its list, non-exhaustive list of examples, also requires Gallagher to prepare, I'm quoting the first sub-item, prepare and handle through the signing process, the reinsurance contracts and addenda there. Why do you hire, yes, okay. Right, why hire a broker if not to handle this process. And pay them they got, Gallagher got 25 million out of this, right? No, Gallagher did not get, the 25 million were premiums, that was a subset of the premiums we paid into the reinsurance cell that Gallagher authorized release to what we know. What did Gallagher get paid? Gallagher received, I don't have the exact number, but it's about two million dollars in fees and commissions and we have not gotten any of that back from Gallagher. So, we think section 13 is the most straightforward basis for reversal here. I would like to briefly address sections 11 and 5, which we think also warrant reversal. Section 11 requires Gallagher to comply with applicable economic laws. There are two distinct sets of economic laws that Gallagher operating as a reinsurance broker in Texas is obligated to comply with. Why would you have said economic, you know, makes sense to talk about economic sanctions laws, but not economic laws as insurance laws, because you're procuring insurance, it's the whole deal is about the obtaining of insurance, so why wouldn't it say insurance laws? It does not say insurance laws, your honor, because there are other relevant laws that Gallagher needs to comply with that are applicable to this transaction. You can imagine, for example, accounting laws or tax laws, which I think fall under the ambit of economic laws. Is there any, is there any contract that is not subject to applicable economic laws in that sense? There are, well, the relevant question here, I think, your honor, is whether our section 11 imposes on Gallagher an obligation in contract to comply with applicable economic laws such that... I understand that, but if, yes, but... You are correct, your honor, that contracts, generally speaking, are subject to applicable laws, but it would not follow that a party to that contract has a cause of action in contract for a failure to abide by those laws unless it's incorporated into the contract. And Texas case law is clear that parties can incorporate outside bodies of law into their contracts. So understanding that section 11 applies to these bodies of law, I don't think there's a meaningful dispute, Gallagher will say otherwise, but I don't think there's a meaningful dispute at the 12B6 stage that we've alleged a failure to comply with those laws. Texas common law requires Gallagher to use reasonable diligence in attempting to place the reinsurance policy. We've alleged at length that that did not happen. It waited until the last minute to begin working on this coverage and begin substantively negotiating it. It failed to notify HOA that Vestu was proposing to use China Construction Bank as the letter of credit issuer, and it did not ensure before or after that China Construction Bank would be replaced with a U.S. bank. You complained a little bit about the sua sponte denial of a motion to amend. What would you have added? We've talked now about sections 13 and 11. What would be different? I think your original complaint is over 40 pages as it is. That's correct, Your Honor. And of course, I'm forced to talk out of two sides of my mouth here because I do think that the complaint is sufficient as alleged, but we do think there's an independent error here in the denial of leave to amend when that issue was not put before the court, the issue of futility or whether leave to amend would be appropriate. As to your question, Judge Douglas, what we would add, we would specifically respond at this stage to the district court's stated concerns, many of which did not quite surface in Gallagher's briefing. It was sort of the first time we were encountering this line of reasoning. I would say one amendment we would make is that we'd revise any verbiage that the court took issue with, suggesting, so the court said, that China Construction Bank does not qualify as any assuming reinsurer. The court on pages 18 and 19 of its 1966 pointed out that we refer to the reinsurers on the one hand and the bank on the other. We were not intending to confine reinsurers as used in the contract to refer only to, for example, White Rock, as Gallagher says. So we would revise that language. We would allege more facts showing that China Construction Bank is the relevant reinsurer in this transaction. I think there's more to be said about the nature of this collateralized reinsurance arrangement under which the entity on the hook for funds is the issuer of the letter of credit, not White Rock. That has become a really salient point in the briefing and we did not anticipate at the complaint stage that it would be an issue. At this point, we would say more, allege more facts about the transaction to make that clear. We would also explicitly allege as to section 13 that the servicing duties customarily performed by reinsurance intermediary brokers include confirming the validity of the collateral before authorizing the release of any funds, especially when there's a request to withdraw $25 million. We further allege that those customary servicing duties include securing the required collateral when finalizing the transaction, that sub one piece of section 13. So those among others would be amendments we would make at this point specifically in response to the district stated concerns. Wouldn't Gallagher have some claim under Texas insurance law? Wouldn't my client have a claim under Texas insurance law? I'm sorry, your client, yes. Yes, Your Honor, it's... Why didn't you plead it? Because we would face... So the answer is that we have a contract with Gallagher and we think our claims sound in contract first and foremost, but the answer, Your Honor, is that the Texas economic loss rule provides that if the parties have, if the subject matter of the dispute is subject to a contract, any economic losses arising out of that misconduct sounds in contract and not in tort. Now, at this stage, we'd be happy to let you... But a violation of the... I mean, we get these from homeowners all the time where they claim that the agent misrepresented the scope of policy or something. And I thought there were implied causes of action under the Texas insurance code. There are, and candidly, Your Honor, if this court decides that the proper disposition is remanded with instructions to amend, we would add a cause of action in the alternative for negligence under the common law. Again, the reason, in fact, that we didn't plead it in the first place is because of this challenge with the... Well, maybe Gallagher can help me about this. Sure, Your Honor. It's possible that in other cases involving insurance agents and brokers that there's not a contractual relationship between the policyholder and the broker, such that the proper cause of action is under the common law. I see ways. Finally, I see my time is running short. I do want to address Section 5. Gallagher independently breached Section 5 of the contract, which required it to retain directly from any emphasis on any assuming reinsurer written evidence that the assuming reinsurer has agreed to assume the risk. Gallagher did not do this. They completely failed to get written evidence that China Construction Bank assumed the risk. The only document they had for the 2022 policy year was this so-called collateral letter from an entity called Yupo Finance Limited, not even China Construction Bank as we expected. Then going into 2023, Gallagher got an updated letter. This is all in the briefs and in the record. This one was now fashioned as a letter of credit. It looked completely different. There's no reason why it should have looked different, and that should have raised red flags for Gallagher. Why didn't it raise red flags for you? Your Honor, in fact, my client relies on reinsurance brokers for precisely this purpose. That is why we hire Gallagher, is to conduct this type of diligence and to close the deal. And under the contract, Your Honor, all of these duties are assigned to Gallagher. All these sections we're reading, they begin with the words Willis-Ree, which is their former name. Willis-Ree shall. These obligations are by contract and by industry practice assigned to Gallagher as the broker, not to HOA. Okay. Unless Your Honors have any further questions. Thank you. No, thank you. You have time for rebuttal. Thank you so much. Okay. Ms. Coberly. Good morning, Your Honors, and may it please the Court. I'm Linda Coberly here for Gallagher-Ree. This is a contract case, and this appeal comes down to contract interpretation to prevail. Plaintiff has to show that Gallagher's contract required it to assess and investigate the collateral obtained by the reinsurer and to be the first to discover and expose a fraud involving forgeries that deceived the entire industry. Well, let me put it very simply. If Gallagher-Ree had bought this reinsurance through Aetna, we wouldn't have a problem. So Gallagher-Ree specializes in unusual forms of insurance. If Gallagher had gone to Lloyd's, we probably wouldn't have a problem. So you're sort of getting out of the normal realm of insurance procurement by definition, right? I would disagree with that, Your Honor. There's two kinds of reinsurance. There's traditional reinsurance, and there's collateralized reinsurance. Collateralized reinsurance is a perfectly acceptable sort of insurance. I'm not saying it isn't. I'm just saying you went to an unusual facility to get it. And so did the plaintiff. All of that was fully disclosed to the plaintiff. And in fact, as we do in all cases of collateralized reinsurance, Gallagher made very clear to HOA exactly what it was and wasn't doing. And this is particularly important when we talk about this $25 million issue that was the subject of the argument earlier. By the time that happened, by the time the $25 million request happened, which isn't by itself suspicious. The plaintiff doesn't allege that the fact that there was that request is suspicious. Their only allegation is that Gallagher-Ree breached the contract by pointing back to the document, the collateral letter that was provided at the time of the transaction. That's the allegation. By that time, however, the plaintiff had signed the client disclosure letter. And what the client disclosure letter said explicitly was that Gallagher had not assessed the collateral. That Gallagher recommended that HOA seek its own professional advice. Is that part of the contract? It may not be part of the original contract. It is a release, however, under Texas law. How can you possibly say that this case should have been dismissed on the pleadings? You're now mounting a defense that goes outside the contract by what you just told us. Your Honor, I'm looking only at the pleadings. Everything I've just said comes down to the pleadings. Well, I looked at the contract, just like the rest of my panel. And it talks about customary administrative services, which I had thought, I mean, I was getting off on a tangent about the Texas Insurance Code, perhaps. But I had thought administrative services was something that was not a term of art, a term of commercial dealing, and therefore would normally be subject to factual inquiry. Your Honor, to resolve this appeal and to resolve the merits of these claims, you don't have to get into what administrative services means. All you need to look at is the fact that that provision specifically refers to services provided after the placement of the reinsurance contract, after the administrative services happens after the placement of the reinsurance contract, period. So, and if I could respond to something Judge Douglas raised earlier, the dismissal with prejudice here was not sui sponte. My client asked repeatedly in its motion for dismissal with prejudice, and HOA never responded to that, never objected to that, never offered to replete, never took issue with the idea that there would be a dismissal with prejudice, did not seek reconsideration on that basis. It wasn't until we were before this court in briefing that the plaintiff said for the very first time, we want to replete. And the only specific allegation even now that they've offered to make to change the pleading is this idea that actually the entity, the financial services institution that provided the letter of credit, China Bank, China Construction Bank, was itself a reinsurer. But that's not a factual allegation, that's a legal argument. And it's based on terms in the contract, which this court resolves as a matter of law. We know that China Bank wasn't the reinsurer because it never signed a contract of reinsurance. A reinsurance under Texas law, a reinsurer under Texas law, and under the plain language of what that word means, is a party that signs a contract of reinsurance. And under what pretext did Gallagher advise HOA to let $25 million go? First of all, Gallagher did not advise HOA to let $25 million go. If you look at the complaint, paragraph 68, here's what it says. So the contract required consent from HOA to release the $25 million. And so, and Gallagher's role was to pass the request on to HOA. So Gallagher did that. When an HOA employee questioned whether the account was adequately capitalized, and I'm quoting the complaint, Gallagher sent HOA the collateral letter from UPO, again referred to it as a letter of credit, and wrote, Treaty Year 2022 still has the $228 million letter of credit as received by HOA, thus the contract is funded to the contract limit and meets Schedule F requirements. There was no insurance that the letter of credit was not a forgery. There was no assurance at that point that Gallagher had done anything to audit the letter of credit. There was no assurance at that point that Gallagher had done anything to audit White Rock or to investigate, do a forensic investigation on this letter. Remember, the problem with this letter was not that it was a collateral letter instead of a letter of credit. The problem was that it was all a forgery. That's the problem. Well, there was, there was, so there was no letter of credit. There was a collateral letter, which is the exact same thing that is contemplated by the reinsurance contract. It was White Rock who had an obligation under the reinsurance contract to obtain collateral. That's what collateralized reinsurance is. White Rock obtained this collateral letter. The collateral letter matched what was provided in Appendix B in the form, the Appendix B to the reinsurance contract. We don't have all that. Where are all these documents in the record? They're all in the record. So if I could explain. So they were all attached to the complaint? They were all incorporated into the complaint by reference. So the collateral letter itself appears, the, the, the, in paragraph. No, no, I'll take it. I, what the problem again, isn't that the collateral letter was a collateral letter and not a letter of credit. For the next treaty year, there was a letter of credit, that something that purported to be a letter of credit from an NAIC approved bank, which was the New York branch of China Construction Bank, which is a real bank. The problem was that all of this was a forgery. It was a forgery, including the collateral letter, which was purported to be signed by an employee of China Construction Bank. What, what Gallagher-Reed did when it sent its client direction letter is it advised its client, HOA, that you may want to do your own work on this because we haven't audited the collateral. We haven't assessed the collateral. What good does Gallagher-Reed do that's worth two million dollars here? I mean, I don't see anything that HOA couldn't have done on their own to find a no-good collateralized insurance contract. Your Honor, the two things. First of all, Gallagher-Reed plays a role. I mean, it's a big company. It's an international company, right? Yes. Gallagher. Yes, and the collateralized reinsurance market is a well-established commercial. Is White Rock a well-established commercial entity? White Rock is a subsidiary of Aon, Your Honor. It's a subsidiary of Aon. West, Westview happened to be an Israeli startup. China Construction Bank is a real bank. It just was, happened to have employees who were in on a forgery fraud. All of this is real legitimate business, Your Honor, and let me speak especially to the administrative services for just a moment. A big part of what Gallagher-Reed is paid for is these administrative services that happen after the contract of insurance is placed, and what that includes is processing all the claims. The way this contract worked, and you can tell by looking at the contract itself, I'm not going outside the pleadings here, is that the premiums would come in from the insurance company. They would go into this account, and both the reinsurer and the insurer would end up paying on the claim. Right. This is a very complicated process. I know, I know a little bit. And it is all, and it is all administered by Gallagher-Reed. That's what Gallagher-Reed was doing to earn its fee. It was administering every single claim that came into HOA, and that was reinsured through this mechanism. It administered every single claim. When I read paragraph 68, there's a number of allegations with respect to the letter, the so-called letter of credit. And you seem to be saying that the administrative services clause of the contract simply doesn't have anything to do with the allegations. Is that right? I mean, is it right, can we say as a matter of law that the obligation to perform administrative services as defined in the contract simply has nothing to do with the allegations with respect to the letter of credit here? I think so, Your Honor, because... How can I know that as a matter of law? Because the very first line of section 13 says performed after the placement of the reinsurance contract. And this doesn't describe actions that happened after the placement of the reinsurance contract? So what the plaintiff is saying is that the administration of reserve funding, which is the last item there, is something that happens after the placement of the insurance contract. And I agree. And you know what else happened after the placement of the reinsurance contract? The client direction letter. The client direction letter after the placement of the insurance contract instructed HOA, we did not audit the collateral. Okay, where is that? Where's the client direction letter? The client direction letter is at page 166 of the record. And what does it come from? And it came from Willis-Ree, Gallagher-Ree. Is it, is it, again, this is, I was looking at the allegations in the complaint and you're referring to a client direction letter, but we're here on the pleadings, right? So the client direction letter is referred to in the complaint. It's referred to in the complaint. That's why we're all within the pleading. Everything I've talked about here is referred to and incorporated in the complaint. And that's why when the district court faced this motion to dismiss and Gallagher-Ree was asking for dismissal with prejudice repeatedly, it looked to the plaintiff to say, do you have anything more to say here? That's, that's where this dismissal with prejudice came from. Everything we're talking about is properly before the court because it is either quoted in or referred to in the complaint. We're talking about documents that the meaning of which is not ambiguous. And we don't, we don't need the court to resolve to have expert testimony, for example, on what is customarily provided by a broker. That's not what I'm resting my argument on here today. I'm saying that what the, the administrative services come after the contract is formed and to the extent the plaintiff is alleging a breach of that provision, it is, I guess, that they thought that, that Gallagher-Ree had, was guaranteeing the collateral when it specifically said it was not. So there can't be a claim of breach on that basis. Which paragraph of the complaint talks about the client direction letter? I, it's a paragraph that frankly accuses the client, the client direction letter of being a I don't have it off the top of my head, Your Honor, but I'd be happy to look for it in just a moment. Okay, thank you. May, let me ask a question. If White, White Rock is the insurer and they provide collateralized, who pays the claims under the, you said HOA and White Rock share that. I understand that. But normally a letter of credit stands behind the obligor. Correct. So White Rock was supposed to pay, right? Correct. And the letter of credit was supposed to stand behind the obligor. And White Rock was, it was White Rock's obligation, not Gallagher's, to obtain the letter of credit. That, that obligation. Yes. And so White Rock obtained something. So why did the insurance fail if White Rock is a bona fide company? I say that, say that again, Your Honor? Why did the insurance fail even though the letter of credit was no good? Was White Rock under collateralized for its obligation in the reinsurance? There was a segregated account, Your Honor, that all of these payments were supposed to come out of. Gallagher is not charged with auditing the reinsurer. I understand. I'm just asking how, I'm sorry, asking why the letter of credit was critical to maintaining the validity of the, of the White Rock's insurance commitment. The reason the letter of credit is critical, Your Honor, is because rating agencies require insurers like HOA to obtain reinsurance. And they can do that either through traditional reinsurance, which is a reinsurer that is A- rated or above, or they can do it through something called collateralized reinsurance. So White Rock was more like a, like an agent for the, for the collateral. No, White Rock was the reinsurer that signed the contract of reinsurance. Right. And again, White Rock is owned by Aon, one of the largest insurance companies in the world. So it's a legitimate company. And, and the letter of credit is, is something that's required by rating agencies for insurance companies like HOA, where you have to have reinsurance up to a certain level. And that's why White Rock was obliged under its contract with HOA to obtain a letter of credit. And that's what it purported to do. Even the collateral letter was purported to be signed by a representative, a vice president of China Construction Bank. And then ultimately China Construction Bank did apparently provide a letter of credit to the, issued by its New York branch, which is an NAIC certified bank. It just happened to be a fake. All of it was a fake and the entire industry was deceived by this, by this fake, this fake letter of credit scheme that was perpetrated by Vestu, which was the funding company. So, so White Rock was obliged to be the reinsurer and there are separate proceedings going on where HOA is suing White Rock. That, that is happening. And I believe there's been a settlement reached in that case. So I- How did it come to light that the letter of credit was a fake? There was a large, there was a whistleblower within China Construction Bank, I believe, that blew the whistle on the whole scheme. This infected, as I said, the whole industry and a whistleblower, I believe, within China Construction Bank. You mean this was more than one insured? Yes. That was involved? Yes. But again, I mean, Willis-Ree is authorized to procure and administer reinsurance. And so Willis-Ree had no obligation to, to check on the collateral since that was an essential part of collateralized reinsurance? It had no obligation. There's nothing in the brokerage agreement, which is the contract between my client and HOA, that required Willis-Ree to do a fraud investigation or to audit White Rock or to evaluate the collateral. And that's where we come to the three contractual provisions. You have section 13, administrative services, which applies only after the placement of the reinsurance contract. You have the provision on economic or trade sanctions laws, which on its face, if you read that provision as a whole, refers to sanctions laws. The last paragraph, the last sentence of that paragraph says, refers to persons or entities sanctioned under economic or trade sanctions. So I mean, earlier we were all focused on section 13. And I just want to understand your argument. Your argument, it seems to me, is not that the content of what administrative services are is ambiguous. And so therefore we need further proceedings to figure out whether your obligation under section 13 extended to somehow examining the letter of Your argument has to do with timing. That's why you keep emphasizing the word after, like the district court did. Is that right? It is. I think you could resolve it either way, but the point I'm focusing on right now. Well, I want to understand your argument, because if you want to talk, you want to say that the content of the obligation to do administrative services is unambiguous. I mean, I just read it. It's quite open-ended. I don't know that as a matter of law from the pleadings. And my response to that, Your Honor, is that you want us to resolve it on the word after. I do. Okay. And to just say that again so that I understand your argument. So administrative services refers to servicing duties performed after the placement of the reinsurance contract. And that includes administering reserved funding. There's nothing in that provision that required any auditing activity before the transaction. There's nothing in that provision that required my client to audit White Rock, validate the collateral, or anything like that. And critically, if we're talking about what happened after the contract, we also have to look at the client direction letter. And if I can't find it in the complaint, do you still want? Yes, because it is in the complaint, Your Honor. It's referenced in the included in the incorporated in the complaint for you to win. On this particular issue, in the sense that I am relying on it, I don't think you need that because of the way the allegations work in the complaint. But if you want to rely on the client direction letter, it needs to be in the complaint. I agree with that. I don't think that is essential. Also, because if you look at paragraph 68, it wasn't like a new, there was no new work done. What paragraph 68 says is that Treaty Year 2022 still has the letter of credit as received by HOA. So all that was being assured there is the thing that was true at the beginning of this transaction is still true today. And that was the case. That was the fact. There's no dispute that the same document that was received by HOA originally was still in effect such as it was. Both Gallagher and HOA had that document in their hands. The complaint says that. Was that writing by Cashion that is referenced in paragraph 68, was that pursuant to sort of administrative services that Gallagher is performing? This was in response to a question by HOA. And the reason HOA was in a position to ask that question is because Gallagher was performing administrative services by transmitting the request for the $25 million. So the answer is yes? Yes. The court has no further questions. Thank you. All right. Thank you. I'd like to start with this last piece on administrative services. What I heard from Gallagher today is that they were paid millions in fees primarily for the administrative services part of this, but also there were no such obligations because they were released and waived in the client direction letter immediately following. Well, what I'm hearing is that the client direction letter is important to evaluating this Section 13 breach. That's what I'm hearing. What can you tell me about the client direction letter and the role that it plays in the complaint? Yes, Judge Duncan. We responded at length to the arguments about the client direction letter. I'll point out the district court did not rely on this at all, the client direction letter. We do talk about it in our complaint, though Gallagher is a bit fighting the pleadings here because the reason we talk about it is because it was part of the cover-up. After this BOSH transaction happened, the reinsurance contract was effective January 1st, 2022. The client direction letter is signed on January 3rd and it says, prospectively, Gallagher, by the way, didn't do anything. We don't vouch for the collateral. We're not, I mean, I can read you language from the disclosure form, but they are forward-looking statements that are meant to be entered into before placement of the contract. On Record on Appeal 169, this is above the signature line. If you wish us to proceed to place this contract, please sign here. In other words, this is meant to be done before it goes down. Separately, the next sentence is, a new authorization will be required for each new policy slash contract and policy period. Recall that there is a 2023 policy period. It got renewed going into 2023 and Gallagher got a new letter of credit. There is no such client direction letter going into 2023. And finally, I emphatically dispute the notion that this was a release of anything. Nowhere does HOA in the text of this letter say, I agree that Gallagher, my broker, has no obligations to use any diligence in administering our contract. To the contrary, if we're going to, for example, release $25 million in cash, we would like our broker to conduct some degree of diligence. I would also like to point out a few other points made by Gallagher. The notion that CCB is not the reinsurer, this is a factual dispute, but White Rock is not on the hook for money. The money that would pay out under a claim comes from the letter of credit. This is a segregated account such that the funds that go into it are separate from White Rock's balance sheet. White Rock would never have been on the hook for the money. China Construction Bank, as the issuer of the letter of credit, was the source of the funds. And we allege that in paragraph 75 of the complaint. More sort of thematically, Gallagher's refrain here is that this was everyone else's fault. It was a big fraud. I want to remind Your Honors that the question here is not whether there were other wrongdoers. We know there were other wrongdoers. We have a litigation against China Construction Bank in New York, and we're proceeding in a bankruptcy against Vestu. You don't have litigation against White Rock? That litigation was settled, Your Honor. The only question before Your Honors is whether Gallagher is among those wrongdoers, and we certainly think they are. And finally, before my time runs out, I would like to address this issue of leave to amend. Again, Your Honors don't need to reach this at all because reversal on the merits and... Well, let me just... You're right, we don't. I'm looking at their record excerpts, and yes, and this is a letter, January 1, 22, inception date, Willis-Reed disclosure regarding collateralized insurance, re-insurance. Are you familiar with that document? Yes, this is what's being referred to as the client direction. That's the client direction. Correct. Because it does seem to disclaim everything, but that's dated January 1. Well, the inception date is January 1. It was, in fact, entered after the fact. You'll see it was signed on January 3 and January 5, signed by Gallagher on January 5. And again, forward-looking, the contract had already been placed and a new authorization is required. So are you calling that an administrative... What are you calling that? We don't think this has anything to do with the administrative services. In fact, the notion that this resolves to the Section 13 question is sort of news to me today. Gallagher does invoke it sort of passingly in its briefing, but they've primarily invoked this letter to disclaim any obligations under the Texas Insurance Code. This is the first time I'm putting thought to the notion that this actually disclaimed all of their servicing duties for the duration of the reinsurance contract, which I think is an implausible suggestion. And certainly, if anything, would be subject to fact discovery. If they're getting millions of dollars to provide administrative services customarily performed in the industry, I don't think they could disclaim everything under the sun as they purport to do here. Well, so they said you referenced this in your pleadings. We referenced it in our pleadings to explain that this was a post hoc effort by Mr. Cashin at Gallagher to cover his tracks. The transaction was botched. It was done in a matter of days before New Year's. And then on January 2nd and 3rd, this comes down and says, by the way, we don't have any responsibilities for anything. I see my time is up. I can address, leave to amend, or I can let your honors proceed with your day. I'm happy either way. All right. No. Okay. Thank you. We ask that you reverse and remand for further proceedings. Thank you.